I see no fault on the part of the Pennsylvania. She slackened her speed, and stopped, and reversed, as soon as she perceived, by the stoppage of the Princeton, and the spreading out of her tow, that there was any risk of collision with any part of the tow. She could not have apprehended any such negligent action on the part of the Princeton. The fact that she passed every thing in safety, except these three port tows, which were in the act of being spread out by the tide through a stoppage by the Princeton, which could not have been anticipated, shows that the collision was wholly due to such action of the Princeton. I think, on the evidence, that the Pennsylvania made the Princeton a little on the port bow of the Pennsylvania, and that, from that moment, in accordance with article 13, the Pennsylvania put and kept her helm to port until the collision, and that she would have cleared the Princeton and the whole of her tow, if the Princeton had not negligently thrown her tow, in the manner already stated, across the track of the Pennsylvania. When too late, the Princeton became aware of the danger in which she had involved her tow, and started ahead, with a view of dragging the boats out of the way of the Pennsylvania, but there was not time to effect the object.

The libels must be dismissed, with costs.

## Case No. 10,947.

### The PENNSYLVANIA.

[4 Ben. 257.] [1]

*District Court, E. D. New York. June, 1870.*[2]

COLLISION AT SEA — STEAMER AND SAILING VESSEL—SPEED IN A FOG—VESSEL LYING TO.

1. A bark was lying to near the George's Banks under shortened sail, with her helm lashed three quarters to port, drifting about a mile an hour. It was very foggy, and a bell on board her was being struck, but no fog horn was blown. A steamer was approaching her nearly at right angles, running at a speed of seven knots an hour. As soon as the bell of the bark was heard, the helm of the steamer was put to port, then changed to starboard, and then again put to port, her engine having been stopped and reversed. She struck the bark amidships and sunk her: *Held*, that the bark was under way, and was bound to have been using a fog horn, instead of a bell.

2. The use of the bell could not have misled or embarrassed the steamer, for the bell was the proper signal to announce the presence of a vessel. not in motion and incapable of getting out of the way, which was, substantially, the condition of the bark.

3. On the evidence, the bell could be heard further than the fog horn.

4. On the evidence, the bark had a proper lookout, and was not guilty of any fault which contributed to the collision.

[Cited in The Atlas, Case No. 634.]

5. It was the duty of the steamer to have reduced her speed to the lowest point, consistent with steerage way.

6. On the evidence, it was not necessary for the steamer to have been running at the rate of seven knots an hour.

[Cited in The City of Panama, Case No. 2,-764.]

7. Her helm was negligently managed.

8. She was liable for all the damages.

In admiralty.

Benedict & Benedict, for libellants.

C. Donohue and J. Chetwood, for claimants.

BENEDICT, District Judge. This action is brought by the owners of the bark Mary A. Troop, to recover of the steamship Pennsylvania, the value of their bark, which was sunk in a disastrous collision, which occurred between those two vessels, on the George's Banks. The owners of the bark, after setting forth in the libel the facts attending the accident, aver that the collision was not caused by any fault on the part of the bark, but was caused by the fault of the steamer,

---

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

[2] [Affirmed in Case No. 10,950; decree of circuit court reversed by supreme court in 19 Wall. (86 U. S.) 125.]

in running at too great speed in a fog, and in not keeping a proper lookout, and in not changing her course, in time to have avoided the bark by going under her stern as she could, and should have done.

The answer of the steamer avers that she was proceeding at a reduced speed, only sufficient to keep her proper course, with a good lookout; that it was so foggy, that a vessel could not be seen more than a length off; that while so proceeding a bell was heard, and immediately the bark hove in sight, too near the steamer for the steamer to avoid her; that the engine of the steamer was at once stopped and backed, and the helm ported, but that the bark was going at a speed of about five knots an hour, with her helm lashed; and being unable to port, came into the steamer, which was then nearly dead in the water.

It will be observed in regard to these pleadings, that there is no averment on either side, that the accident was inevitable. On the contrary, specific faults are set forth, as the sole cause of it. The duty of the court therefore is to determine, which of these faults appear to be proved by the weight of the evidence. It will be convenient to consider first, the faults charged against the bark. It is charged that she was going at the rate of five miles an hour, with her helm lashed. The proofs show the bark, at the time of the collision, to have been hove to, with her helm lashed three quarters to port, and under two reefed topsails, foresail, fore-topsail and mizzen staysails, with little or no headway through the water, drifting to leeward nearly broadside to the steamer as she approached. She had the right to lie to, and, being without headway, with her helm lashed, it is manifest that she could make no movement to avoid the steamer, she was not at anchor, but under way, and by the international navigation rules she was bound to use a fog horn, to announce her presence to other vessels. Instead of a fog horn she was using a bell, and this is also charged upon her, as a fault which must render her responsible for the collision. But it is obvious, that the use of a bell instead of a horn, on the part of this bark, could have no effect to mislead or embarrass the steamer; for the bell was the proper signal to announce the presence of a vessel not in motion, and incapable of getting out of the way; and such substantially was the position of the bark. Her slight drift would have no substantial effect to change her position, within the time that would elapse, after it became possible for the steamer to be made aware of her presence, by either horn or bell; nor could she within that time acquire any headway. Her bell required that she should be considered by the steamer, to be, what she was in effect, and so affords the steamer no excuse for an improper manœuvre, if she adopted one. But the bark cannot be absolved from responsibility by reason of her bell, unless it also appear that the sound of the bell would be heard as soon as the sound of the horn. This the proofs show, for it is proved that the bark had on board a fog horn, and an unusually large bell, and that it was judged by those on the bark, that the sound of such a bell could be heard further than the sound of a horn, whereupon, instead of using the horn, the bell was rigged upon the forestay and rung by a lanyard from its clapper. The opinion then formed by those on the bark, as to the efficiency of the bell, is reiterated upon the stand by the witnesses from the bark, and is confirmed by other witnesses, who testify to the fact, that the bell would be heard farthest, and also by the fact of the adoption of the bell, in place of the horn. Under such circumstances, it is incredible that the officers of this vessel, loaded with pig iron, lying in a dense fog where steamers were known to be passing, with their lives depending upon the efficiency of their fog signal, and with full means of knowledge, should have selected the least effective of two signals in their possession. The averment of the answer, that the bell was permitted to remain unrung, relying upon the motion of the vessel, to cause it to tinkle when she rolled, is not only improbable, but is disproved by the steamer's lookout. The description of the sound of the bell, as he heard it, proves the bell to have been struck by hand, as the witnesses from the bark say it was rung.

This testimony of the steamer's lookout, in regard to the bell he heard, also disposes of the ingenious argument, which has been made in support of the averment of the answer, that the bark had no lookout, and shows beyond controversy, that there was a man stationed on the bark's forecastle, where the bell was, who was doing all that could be done; namely, ringing the bell. The witnesses from the bark are thus confirmed in their statements as to the lookout, by the witnesses from the steamer.

I have thus disposed of the faults charged upon the bark, and it remains to consider the faults charged upon the steamer.

The testimony which has been produced on her behalf, taken in connection with her answer on file, presents some features worthy of notice.

In regard to her wheel, the averment of the answer is, that it was ported when the bark was seen. The testimony of the second officer, who was officer of the watch and on the bridge, is, that the wheel was put hard a-port, as soon as the bark was seen, but he does not say who gave the order, and he leaves it to be inferred that no other order was given. But the quartermaster, who was at the wheel, testifies, that he first received from the officer at the con an order to port, which he obeyed; that he next received from the same officer an order to hard a-starboard, which he obeyed, and next the

captain ordered him to port, which he did. This witness further says that another man, whose name he gives, was with him at the wheel, and that when the order "hard a-starboard" came, he called three of the watch, who were then heaving the log, to help him heave the wheel, and they did so. Neither of these other seamen are produced, and neither the master nor the officer at the con, nor the second officer—all of whom gave their testimony some months after the deposition of the quartermaster had been taken—make any denial of the quartermaster's statement. So specific a statement, by the man in charge of the wheel, demanded some explanation, or a more specific denial than has here been given. So too, the condition of the testimony introduced by the steamer, in respect to her speed, has attracted my attention. No rate of speed is given in the answer, but it is stated that the steamer was running at a reduced rate, only sufficient to keep her proper course. The officer of the watch, whose duty it was to know the speed at which the steamer was running in such a fog, makes no statement as to the rate of speed, nor does it appear that he had given any order to the engineer, prior to seeing the bark. The telegraph, he says, was at "stand by," and he simply says "We were going at reduced speed, I believe." The engineer on duty at the engine, does not speak of the rate of speed, nor does he say how he was running the engine. The chief engineer, who was not on duty, expresses no opinion as to the speed or the action of the engine, but says that the pressure of steam was seventeen pounds, the ordinary pressure being nineteen to twenty pounds. Neither the officer at the con, nor the boatswain's mate, both of whom were on deck and on duty, allude to the speed. The only witness who does give the rate is the master, who says that the steamer was running at the rate of seven knots an hour, and, in answer to an enquiry whether, with the wind and sea as it was, he could have run the steamer safely at less speed, his answer is, "I don't consider we could have steered the vessel going slower, i. e., could not have steered her straight." Now while, in the absence of any testimony to the contrary—or any circumstances which can be considered as clearly inconsistent with the master's statement, that his speed was seven knots, I consider that rate to be proved, I feel bound to say, that I do not deem his statement in regard to his inability to run safely at less speed, as satisfactory proof of such inability, when taken in connection with the evidence as to the wind and sea, and the testimony produced showing that this steamer has been known to run and hold her course at a much less rate. Upon such evidence, I am unable to bring my mind to the conclusion, that it was necessary or proper for this steamer to be running at a speed of seven knots in such a fog.

I am thus brought to a decisive point, in the consideration of this case, for it was the clear duty of this steamer, under the circumstances to reduce her speed to the lowest point, consistent with steerage way. There is, I am aware, a notion entertained by some commanders, that they are justified in running at full speed in fog at sea, upon the ground that the time of exposure to peril is thereby lessened, and, if a collision does occur, the chance of injury to the steamer is diminished. But such a practice, if safer for the steamers, is full of danger to all smaller vessels, and cannot be upheld. The maritime law imposes upon a steamer, running in a thick fog at sea, the duty of at least slackening her speed to the lowest possible point, consistent with steerage way. Beyond this the facts of the present case do not require the rule to be extended; and, if the remark can be permitted in view of some adjudged cases, I may add that it is quite possible that fog dense enough to render it impossible to see a vessel at any available distance, is so constant a feature in portions of the Atlantic voyage, as to make it impossible in some localities, to, act under any more stringent rule, in regard to speed, than the one I have stated. That rule this steamer failed to comply with, and because of that neglect she must be held responsible for the collision in question, which an observance of the rule would have prevented. In this view of the case, it becomes unnecessary to consider at length the other faults, which are charged upon the steamer; and I content myself with adding the observation that the negligent management of the helm on the part of the steamer, which the evidence discloses, tends to confirm the opinion that she was negligently run. For it is quite clear, that if the steamer's helm had at once been hove hard-a-port, when the bark was seen and kept so, there would have been no collision, and it is certainly probable, that the same would have been the case, if the helm had been hove hard a-port, when the bell of the bark was first heard; instead of which the helm, when it was changed, was first put a-port, then changed to hard a-starboard, and then again to port. In accordance with these views a decree must be rendered condemning the steamer, as in fault and liable to pay the damages, sustained by the loss of the bark.

[NOTE. Pursuant to the order of the court, a reference was had to a master to ascertain the value of the vessel at the time of her loss. The exceptions to the master's report filed by claimant were overruled, and the report confirmed. Case No. 10,948. Subsequently an appeal was taken to the circuit court, where the decree of the district court rendered in this case was affirmed. Id. 10,950. On appeal to the supreme court, the decree of the circuit court was reversed, it being held that both vessels were in fault. 19 Wall. (86 U. S.) 125. Thereupon the claimants, not having alleged that they had sustained any damages by reason of the collision, moved in the circuit court for leave to amend their answer in that respect. The motion was granted. Case No. 10,951.]